IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

JASON RAY,

      Plaintiff,

v.                                      No. 15-1015

MADISON COUNTY, TENNESSEE;
DAVID WOOLFORK, SHERIFF;
CAPTAIN TOM RUDDER, JAIL
ADMINISTRATOR and SERGEANT
CHESTER LONG, JR.,

      Defendants.

---

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

*INTRODUCTION*

On January 29, 2015, the Plaintiff, Jason Ray, brought this action against the Defendants,

Madison County, Tennessee (the "County"); David Woolfork, former sheriff of the County; jail

administrator Captain Tom Rudder, and corrections officer Sergeant Chester Long, Jr., alleging

violation of his constitutional rights pursuant to 42 U.S.C. § 1983, as well as false imprisonment

in violation of Tennessee law. (Docket Entry "D.E." 1.) Before the Court is the Defendants'

motion for summary judgment. (D.E. 21.)

*STANDARD OF REVIEW*

Rule 56 of the Federal Rules of Civil Procedure provides in pertinent part that "[t]he

court shall grant summary judgment if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The court must view all evidence in the light most favorable to the nonmoving party, and

draw all justifiable inferences in the nonmoving party's favor. *Ondo v. City of Cleveland*, 795 F.3d 597, 603 (6th Cir. 2015). "There is a genuine issue of material fact only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (internal quotation marks omitted). "The test is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* (citing *Anderson*, 477 U.S. at 251-52) (internal quotation marks omitted). The moving party must initially show the absence of a genuine issue of material fact. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). It is then incumbent upon the nonmoving party to "present significant probative evidence to do more than show that there is some metaphysical doubt as to the material facts to defeat the motion." *Id.* (internal quotation marks omitted).

*FACTS*

The following facts are undisputed unless otherwise noted.[1] On June 3, 2013, Ray pleaded guilty to theft of property over $60,000, a Class B felony under Tennessee law. Specifically, over a two-year period, the Plaintiff stole money from First Assembly of God Church in Jackson, Tennessee, where he served as secretary, treasurer and youth director, by using his power as treasurer to write checks to himself in amounts ranging from $500 to $600. The judgment issued by the Criminal Circuit Court of Madison County, signed by Circuit Court Judge Donald H. Allen on July 31, 2013, reflected a sentence of ten years with incarceration for eleven months and twenty-nine days and the remainder to be served on supervised probation. (D.E. 24-3 at PageID 263.) The form contained the following statement: "Minimum service prior to eligibility for work release, furlough, trusty status and rehabilitation programs" followed

---

[1]The parties are instructed, in future filings with the Court, to cite to the record by utilizing the Docket Entry and PageID numbers reflected on the docket.

by "(Misdemeanor Only)" and a blank space for a percentage. (*Id.*) Judge Allen had placed "75" in the blank. (*Id.*)

In a declaration submitted to the Court contemporaneously with the instant motion, the judge recalled that Ray's sentence was for "split confinement" under Tennessee Code Annotated § 40-35-306. This type of sentence, known as "shock probation," requires an offender to serve a period of continuous confinement of up to one year in a local jail before being placed on probation. *Shorts v. Bartholomew*, 278 S.W.3d 268, 275 (Tenn. 2009). Allen also averred that

> Plaintiff was sentenced to 10 years to serve 11 months, 29 days in the local county jail at 75% release eligibility status, which meant, in part, that Mr. Ray was not entitled to any work time or trust[y] jail credits until he served 75% of his sentence. Mr. Ray would then serve the remaining 9 years, 1 day on probation to be supervised by the Community Corrections Program.

(D.E. 21-3 ¶ 6.)

Ray began serving his sentence at the Madison County Jail (the "Jail") on July 18, 2013. Inmates enter the Jail with a disposition sheet, a written form meant to ensure information concerning what occurred in the courtroom is accurately transmitted to the incarceration facility. Although not an official court document, it has a signature line for the presiding judge. The form is reviewed by Jail personnel and the sentence entered into the facility's computer system. Sometime, and often weeks, thereafter, the actual judgment is forwarded to Jail officials. The parties are in agreement that the judgment form is then compared to the disposition sheet. If there are discrepancies between the forms or questions about the sentence, the attorneys or the judge are contacted for clarification. It is undisputed that Ray's disposition sheet, signed by Judge Allen, contained no indication that he could not be designated as a trusty or receive trusty credits.

It is also undisputed that the County had policies governing eligibility for the trusty program. In his declaration, Defendant Rudder further related that "[i]t is the policy of the Madison County Sheriff's Department to appropriately calculate inmates' release dates, correctly apply jail credits and timely release inmates pursuant to Tennessee state statutes, cases, Attorney General Opinions and in accordance with the judgments of the Courts." (D.E. 21-4 ¶ 4.) He articulated that "[a]ll correctional officers who deal with calculating inmates' release dates are trained on how to accurately enter sentences into the Madison County Sheriff's Department computer system, calculate sentence release dates, and apply jail credits in accordance with the policies and procedures of the Sheriff to ensure the timely release of inmates." (*Id.* ¶ 5.) According to his deposition, this training consisted of discussions between him and Defendant Long relating to how sentences were calculated. (D.E. 24-13 at PageID 382-84.) In his deposition, Long recalled receiving in-house, on-the-job training, but could not remember the dates or specific content thereof. (D.E. 24-12 at PageID 350-55.) Ray disputes the assertions that the County has any written policy whatever relative to the calculation of work credits.

The Jail's trusty program permitted eligible inmates to work in the kitchen and laundry room, and to clean cells. For purposes of summary judgment, it is undisputed that, once an inmate is nominated for trusty status, the final decision on whether such nomination will be approved is delegated by the sheriff to Long or, if there is a question about eligibility, to Rudder. Five days after his arrival at the Jail, Ray was designated as a trusty inmate worker and assigned to the kitchen. On July 23, 2013, he signed an Inmate Worker Policy Contract. Trusty status brought with it certain privileges, including a white jumpsuit instead of the blue one worn by the general population, residence in a trusty-only pod, permission to wear tennis shoes, extra food, special dining times and as much tea as one wanted. In his particular job, Ray cooked, cleaned

4

and passed out meal trays throughout the day. His work required him to rise at between 2:30 and 3:00 a.m. in order to serve breakfast at 4:30.

On October 24, 2013, he was mistakenly released as a result of a miscalculation of his sentence by a corrections officer.[2] In November 2013, Judge Allen became aware that Ray was no longer incarcerated. Allen phoned Long on November 14, 2013, to inquire about the early release. At that time, Long did not realize Ray was no longer at the Jail, but promised to investigate the matter. During the conversation, Allen advised Long that, pursuant to the sentence, Ray was not to receive the so-called "two-for-one" work credits referred to in Tennessee Code Annotated § 41-2-146, which provides that "[w]ork performed by [the] prisoner . . . shall be credited toward reduction of the prisoner's sentence in the following manner: for each one (1) day worked on such duties by the prisoner the sentence shall be reduced by two (2) days."[3] Tenn. Code Ann. § 41-2-146(b).

_____

[2]That officer is not a party to this action.

[3]In his brief, Ray argues that he was told he would receive two-for-one credit for his work as a trusty (*see* D.E. 24-1 at PageID 220), citing page forty-seven of his deposition (D.E. 24-11 at PageID 308). Therein, he testified that *the contract* was "worded . . . somehow" to show he would receive two-for-one credit. (D.E. 24-11 at PageID 308.) The document, a copy of which was provided to the Court by the Plaintiff, states in its entirety as follows:

> Even though the Madison County Jail/Penal Farm/Annex has granted you work privileges, you are still a sentenced inmate of the Madison County Penal Farm and as such are expected to follow the rules of this facility.
>
> If for some reason you are suspended from your work duties, a member of Administration will review your case individually and determine if you are to be reinstated to worker status. If you lose your worker status, you will receive no work credit.
>
> You are not to ask or question any Officer regarding your time or your release date. A member of Administration will notify you within 30 days of you[r] release date.

(D.E. 24-4 at PageID 265.)

The judge directed Long to have Ray picked up and returned to the Jail to serve the balance of his sentence. Long went to Rudder, his supervisor, to discuss his conversation with Allen and his instructions. It is undisputed that, pursuant to County policy to ensure inmates' sentences were adequately recorded into the Jail's computer system, Long and Rudder went to Allen's office to discuss the sentence. In his declaration, Judge Allen recalled that he "explained to Captain Rudder and Sergeant Long that pursuant to [the seventy-five percent] provision [contained in the judgment order], Plaintiff was not entitled to work credits until he served 75% of his sentence. Both Sergeant Long and Captain Rudder stated that they understood [Allen's] orders and pursuant to [his] orders would not apply work credits to Plaintiff's sentence." (D.E. 21-3 ¶ 8.) After the meeting, Long phoned the Plaintiff and instructed him to return to the Jail, as he had been released too early. Ray voluntarily complied on November 17, 2013.

Upon his reincarceration, Ray continued to work as a trusty. On November 24, 2013, through his attorney, Jennifer Free, Plaintiff moved before Judge Allen to suspend the balance of his sentence or, in the alternative, for work release. At the conclusion of the hearing on the motion, at which Plaintiff was present, Allen denied the relief sought on the grounds that Ray was not permitted to receive work credits until he had served seventy-five percent of the sentence. He stated from the bench as follows:

> Now, I want to make sure it's clear too, he's not eligible for any type of work release credits. He's not eligible for any type of trust[y] credits. The only credits that he can earn are good behavior credits.[4] That's the reason it's listed at 75 percent. So, you know, once he's served a minimum of nine months in jail then if he's behaved himself in jail then the sheriff could give him good behavior credits and let him out on this 11 months and 29 day period of shock incarceration. You know, that was the intent of the Court. That's the Judgment of the Court and I still feel like that's the proper sentence.

---

[4]Good time credits provide an inmate a one-quarter deduction from his sentence for good behavior. He cannot receive good time and work credits at the same time.

(*Id.* at PageID 118.)  According to his declaration, it was Judge Allen's opinion that, if the County had applied work credits to Ray's sentence prior to his serving seventy-five percent, it would have been a violation of his order.  In not applying the credits, the municipality was in compliance with his ruling.  In his deposition, Ray admitted that, during the hearing, Allen stated that he "would not be getting trusty time."  (D.E. 21-7 at PageID 156-57.)  The original judgment was not amended and the decision was not appealed.

After the hearing, Ray returned to work in the Jail kitchen as a trusty, where he remained until his release on April 16, 2014.[5]  He testified in his deposition that he was informed by Long and Rudder upon his return to the Jail that if he worked as a trusty, he would receive trusty credit.  (D.E. 24-11 at PageID 331-35.)  He recalled that another officer, Deputy Birdwell, asked him why he was still a trusty if he was receiving no credits and said, "That's not right." (*Id.* at 337.)  Plaintiff alleges that, because Defendants failed to apply trusty credit to his sentence, he was held some seven weeks beyond the appropriate end of his sentence, which, he claims, should have been approximately February 23, 2014.

*ANALYSIS*

At the outset, the Court notes that, in his response to the dispositive motion, the Plaintiff concedes that Sheriff Woolfork should be dismissed as a Defendant in this matter.  Accordingly, the claims against him are DISMISSED.  The remaining individuals, Long and Rudder, are referred to herein as the "Individual Defendants."

---

[5]In calculating this release date, the Jail applied good time credits.

*Federal Claims.*

Section 1983 Generally.

Section 1983 provides a private right of action against any person who subjects "any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights[ or] privileges . . . secured by the Constitution and laws[.]"  42 U.S.C. § 1983; *Rehberg v. Paulk*, 132 S. Ct. 1497, 1501 (2012).  The statute "creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere." *Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001) (citing *Okla. City v. Tuttle*, 471 U.S. 808 (1985)).  A plaintiff suing under the statute must demonstrate the denial of a constitutional right caused by a defendant acting under color of state law.  *Carl v. Muskegon Cty.*, 763 F.3d 592, 595 (6th Cir. 2014).

Liability of the Individual Defendants.

Long and Rudder have been sued in their official and individual capacities.  Official capacity claims "are the equivalent of claims brought against the county as a government entity." *Coley v. Lucas Cty.*, 799 F.3d 530, 542 (6th Cir. 2015).  Because these claims as to the Individual Defendants are redundant, they are DISMISSED.  *See Holmes v. City of Jackson*, No. 15-1253, 2016 WL 379799, at *3 (W.D. Tenn. Jan. 29, 2016) (where official capacity claims against individual officers were in effect a suit against the city, dismissal was warranted).

The Individual Defendants have invoked the doctrine of qualified immunity, which protects officials from damages liability in their individual capacities.  *See Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015).  Qualified immunity "shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights." *McDonald v. Flake*, ___ F.3d ___, 2016 WL 767312, at *4

(6th Cir. Feb. 29, 2016) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "A plaintiff who brings a § 1983 action against such an official bears the burden of overcoming the qualified immunity defense" once it is invoked by the defendant. *Id.; Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681 (6th Cir. 2013). "At the summary judgment stage, the plaintiff must show that (1) the defendant[s] violated a constitutional right and (2) that right was clearly established. In so doing, the plaintiff must, at a minimum, offer sufficient evidence to create a genuine issue of fact, that is, evidence on which a jury could reasonably find for the plaintiff." *McDonald*, 2016 WL 767312, at *4 (internal citation & quotation marks omitted). The elements may be addressed in any order. *Brown v. Chapman*, ___ F.3d ___, 2016 WL 683260, at *6 (6th Cir. Feb. 19, 2016). If the court determines that "either one is answered in the negative, then qualified immunity protects the official from civil damages. *Id.*

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (internal quotation marks omitted). A "case directly on point" is not required; rather, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* "The dispositive question is whether the violative nature of *particular* conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (internal citation & quotation marks omitted). "This exacting standard gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011)) (internal quotation marks omitted).

The Plaintiff has identified the Defendants' actions in holding him beyond his sentence as a deprivation of his rights under the Fourth and Fourteenth Amendments. He alleges that the Individual Defendants knew or should have known it was within the sole discretion of the sheriff to allow him to participate in a work program and that County officials had the concomitant responsibility to apply the appropriate credits to his sentence. Therefore, he contends, he had a liberty interest in the work credits that Judge Allen's order and instructions could not defeat.

As the Sixth Circuit Court of Appeals noted in *Shorts v. Bartholomew*, 255 F. App'x 46 (6th Cir. 2007), "[it] is beyond dispute[ that] when a prisoner's sentence has expired, he is entitled to release." *Shorts*, 255 F. App'x at 51. "This liberty interest is most often attributed to the Due Process Clause of the Fourteenth Amendment."[6] *Id.* The Due Process Clause[7] "contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Martin v. O'Brien*, 207 F. App'x 587, 589 (6th Cir. 2006) (internal quotation marks omitted). Prisoners do not have an inherent right to work or good time credit. *Id.* at 589-90 (citing *Hansard v. Barrett*, 980 F.2d 1059, 1062 (6th Cir. 1992)).

A state may create a liberty interest through its enactment of statutory or regulatory measures. *Hansard*, 980 F.2d at 1062; *see also Shorts,* 255 F. App'x at 59 ("when the state itself creates a statutory right to release from prison, the state also creates a liberty interest and must follow minimum due process appropriate to the circumstances to ensure that liberty is not arbitrarily abrogated," quoting *Haygood v. Younger*, 769 F.2d 1350, 1355 (9th Cir. 1985)). In

---

[6]As the parties appear to be in agreement that the constitutional violation at issue in this case arises from the Fourteenth Amendment, the Court assumes any claim under the Fourth Amendment has been abandoned.

[7]The clause provides in pertinent part as follows: "nor shall any State deprive any person of life, liberty, or property, without due process of law . . ." U.S. Const. amend. XIV.

*Shorts*, the Sixth Circuit adopted the three-part deliberate indifference analysis applied by the Third Circuit in *Sample v. Diecks,* 885 F.2d 1099 (3d Cir. 1989), to claims of over-detention. *Shorts*, 255 F. App'x at 54-55.  Under this test, the plaintiff must show "that a prison official had knowledge of the prisoner's problem and thus of the risk an unwarranted punishment was being, or would be, inflicted"; (2) "the [defendant] either failed to act or took only ineffectual action under circumstances indicating that his or her response to the problem was a product of deliberate indifference to the prisoner's plight" and (3) "a causal connection between the [defendant]'s response to the problem and the infliction of the unjustified detention."  *Id.* at 55. Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997).  The state actor must have been deliberately indifferent "to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Id.* at 411.

Plaintiff maintains that the State of Tennessee created a statutory right to work credits through the enactment of Tennessee Code Annotated § 41-2-147, which provides:

> (a) [t]he sheriff or administrative authority having responsibility for the custody of any person sentenced to a local jail or workhouse pursuant to the provisions of . . . § 40-35-302 [or] § 40-35-306 . . . shall, when a person has become eligible for work related programs pursuant to those sections, be authorized to permit the person to perform any of the duties set out in . . . § 41-2-146.

> (b) Work performed by a prisoner under this section shall be credited toward reduction of the prisoner's sentence in the following manner:  for each one (1) day worked on such duties by the prisoner the sentence shall be reduced by two (2) days.

Tenn. Code Ann. § 41-2-147(a)-(b).  Because the two-for-one credits are mandatory and affect an inmate's release date from custody, he submits, the statute creates a liberty interest for individuals such as himself who participate in the Jail's trusty program.

He also cites § 40-35-302, which governs misdemeanor sentencing[8]:

(c) When a defendant is serving a misdemeanor sentence, the defendant shall be continuously confined for the duration of the sentence except as provided in subsections (d) and (e); provided, that nothing in this section shall be construed as prohibiting a defendant, in the discretion of the workhouse superintendent or sheriff, from participating in work crews during the time the defendant is to be continuously confined.

(d) In imposing a misdemeanor sentence, the court shall fix a percentage of the sentence that the defendant shall serve. After service of such a percentage of the sentence, the defendant shall be eligible for consideration for work release, furlough, trusty status and related rehabilitative programs. The percentage shall be expressed as zero percent (0%), ten percent (10%), twenty percent (20%), thirty percent (30%), forty percent (40%), fifty percent (50%), sixty percent (60%), seventy percent (70%) but not in excess of seventy-five percent (75%). If no percentage is expressed in the judgment, the percentage shall be considered zero percent (0%). When the defendant has served the required percentage, the administrative authority governing the rehabilitative program shall have the authority, in its discretion, to place the defendant in the programs as provided by law. In determining the percentage of the sentence to be served in actual confinement, the court shall consider the purposes of this chapter, the principles of sentencing and the enhancement and mitigating factors set forth in this chapter and shall not impose such percentages arbitrarily.

Tenn. Code Ann. § 40-35-302(c)-(d).

In addition, Ray refers the Court to the unreported Tennessee Court of Criminal Appeals' decision in *State v. Coley*, No. W2012-01122-CCA-R3-CD, 2013 WL 2423932 (Tenn. Ct. App. June 3, 2013), which discussed the interplay between § 40-35-302 and the work credit statutes. Coley was convicted of felony and misdemeanor offenses by the same judge who sentenced Ray.

_____

[8]In doing so, the Plaintiff recognizes that Judge Allen mixed misdemeanor statutory provisions with a felony sentence. The parties disagree as to whether this is appropriate under Tennessee law. Ray points to Rudder's deposition testimony that he was unaware of any authority for commingling a misdemeanor seventy-five percent designation with a felony sentence. (D.E. 24-13 at PageID 410-11). The Individual Defendants counter by citing to Tennessee Code Annotated § 40-35-211, which provides that, if a defendant is convicted of a felony but is sentenced to less than one year in the local jail, he shall be sentenced as in the case of a misdemeanor and shall be entitled to sentence credits. Tenn. Code Ann. § 40-35-211(3). The statute goes on to state that "[u]pon the defendant becoming eligible for . . . trusty status . . . as specified in § 40-35-302(d), the defendant may be placed in the programs by the sheriff . . ." *Id.*

*Coley*, 2013 WL 2423932, at *1. Typed under the heading "Special Condition" on the judgments for misdemeanor convictions was a requirement that incarceration be served in the Madison County jail rather than the county's penal farm and that he was not eligible for work release or "any other special jail credits." *Id.* Handwritten on one of the misdemeanor judgments was added "(other than good behavior credits)." *Id.* (alterations omitted). On direct appeal, Coley argued that the trial court lacked authority to place restrictions on the earning of credits and the manner in which they were earned. *Id.* Specifically, he asserted that he should have been entitled to sentence credits under § 41-2-147. *Id.*

The appellate court interpreted §§ 40-35-302 and 41-2-147 "to provide for a sheriff in whose custody a defendant is placed, to have the discretion and authority to determine if the defendant can participate in work related programs pursuant to [§] 41-2-147 and receive the '2 for 1' sentence credits allowed by subsection (b) of that statute." *Id.* at *3. As § 41-2-147 "clearly delineates the *sheriff's* authority as it relates to inmates," the court found it "error for the trial court to impose a special condition in the misdemeanor judgments which in effect prohibited the sheriff of Madison County from carrying out his statutory responsibilities as to the [d]efendant, as they relate[d] to [§] 41-2-147." *Id.* *Coley* has not been cited in any subsequent cases.

Ray maintains that, under § 40-35-302, § 41-2-147 and *Coley,* he was eligible to be placed in a work program at the discretion of County officials. Once a trusty, he was entitled to two-for-one credit. Further, based on *Coley*, he insists that it was "well-settled" and "abundantly apparent" to Jail officials in July 2013 that their statutory responsibility was clearly defined by Tennessee statute and that, despite Judge Allen's order and instructions, discretion in matters

involving an inmate's participation in work crews and receipt of credits for performing such work lay solely with the County official.

The Individual Defendants do not dispute that a county official has a duty to calculate sentence credits or that inmates eligible for trusty status and trusty credits who then work as trusties at the Jail are generally entitled to two-for-one credits. Their position is that nothing prohibits a judge from forbidding an inmate from receiving such credits and Judge Allen did just that. They point to a previous unreported Tennessee Court of Appeals case, *State v. Lewis*, No. M2004-02450-CCA-R3-CD, 2006 WL 1816317 (Tenn. Ct. App. June 28, 2006),[9] as incongruous with *Coley* on the question at issue. Lewis was convicted of driving under the influence. *Lewis*, 2006 WL 1816317, at *1. In the judgment, the trial judge ordered that his sentence be served at 100 percent before he would be eligible for work release, furlough, trusty status or rehabilitation programs. *Id.* The appellate court stated:

> We construe the phrase "has become eligible for work-related programs . . ." to mean that the inmate may be authorized to participate in such programs only after he or she has served the fixed percentage of the sentence as set by the court. Thus, the *trial court* controls the eligibility to participate in these programs to the extent that the court fixes the percentage of confinement required before participation in the "two for one" work programs is permitted.

*Id.* at *7 (emphasis added) (internal footnote omitted); *see also Tenn. Handbook Series: DUI: Crime & Consequences in Tenn.* § 8.12 (2015-16 ed.) ("[t]he phrase 'has become eligible for work-related programs' has been interpreted to mean that the inmate may be authorized to participate in such programs only after he or she has served the fixed percentage of the sentence as set by the court. Accordingly, the trial court controls the offender['s] eligibility to participate in these programs by fixing the percentage of confinement required before participation in this

---

[9]Appeal to the Tennessee Supreme Court was denied.

program is permitted," citing *Lewis*). *Coley* made no mention of *Lewis* and no later cases have discussed the relationship, if any, between the two. The Individual Defendants argue that, in light of *Lewis* and its interpretation of Tennessee law, a reasonable officer could have concluded that, if Ray was not eligible for trusty credits until he had served seventy-five percent of his sentence, as determined by the trial judge who controlled that eligibility, he had no liberty interest in those credits even if he worked while in jail. Considering the apparent contradiction created by the two cases, the Court finds that the Plaintiff has failed to establish that *Coley* placed the question of whether the Individual Defendants' actions were deliberately indifferent "beyond debate."

Plaintiff also submits that the Tennessee Supreme Court's determination in *Shorts* supports his position. That decision addressed the specific question, certified by a federal court in this district, of whether Tennessee Code Annotated § 8-8-201(a)(3), which sets forth the duties of a county sheriff, requires a person in that position to calculate the release date and order the release of a prisoner serving a period of incarceration in a county jail. *Shorts*, 278 S.W.3d at 270. The statute provides in pertinent part that a sheriff is to

> [t]ake charge and custody of the jail of the sheriff's county, and of the prisoners therein; receive those lawfully committed, and keep them personally, or by deputies or jailer, until discharged by law; be constantly at the jail, or have someone there, with the keys to liberate the prisoners in case of fire; provided, that if two (2) or more counties enter into an interlocal agreement providing for a jail to serve the counties which are parties to the agreement, the sheriff of any county which is party to such agreement shall not take charge and custody of the jail shared by the agreeing counties unless the interlocal agreement so provides, nor shall the sheriff have charge of the prisoners lawfully committed to such a jail unless so provided by the interlocal agreement.

Tenn. Code Ann. § 8-8-201(a)(3).

In analyzing the issue before it, the state's highest court noted that subsection (a)(1) of the same statute articulates that it is the duty of the sheriff to "[e]xecute and return, according to

law, the process and orders of the courts of record of this state, and of officers of competent authority, with due diligence, when delivered to the sheriff for that purpose." *Shorts*, 278 S.W.3d at 281. "Under this subsection," the court recognized, "a sheriff has the duty to see that the orders of the courts, including judgment orders, are enforced." *Id.* The court also observed that

> local jailers or superintendents have the duty, under several statutes, to determine any sentencing credits earned by a defendant serving a sentence of split confinement. *See, e.g.*, Tenn. Code Ann. §§ 41-2-145, -146 and *-147* (2006). Since those must be granted and calculated locally, it is reasonable to repose all calculation responsibilities on the local jailer or superintendent.

*Id.* (emphasis added). The court held:

> [W]e conclude that the language of Tennessee Code Annotated [§] 8-8-201(a)(1) & (3) . . . includes a duty to note the confinement period designated on a judgment order of split confinement involving continuous confinement for a period of one year or less, determine and apply sentence credits, if any, calculate the release date, and release a prisoner at the appropriate time.
>
> Like the participants in this case, we believe the existing statutes are inconsistent and overlapping, while at the same time leaving gaps concerning the responsibility for sentence calculation and release in all situations. . . . The statute does . . . impose a duty upon a Tennessee sheriff to enforce the terms of a judgment ordering a sentence of split confinement. This duty includes noting the term of confinement provided for in the judgment order, crediting the prisoner for time served as indicated on the judgment order, calculating any credits that may be earned, and timely releasing the prisoner at the conclusion of the period of confinement ordered.

*Id.* at 282 (alterations omitted). Ray asserts that, based upon *Shorts*, it was clearly established in 2013 that Tennessee sheriffs and their designees had an obligation to calculate credits earned by inmates serving split confinement sentences, apply those credits and release them in a timely fashion.

However, as noted above, the court based its decision on Tennessee Code Annotated § 8-8-201, a statute not relied upon or discussed in Plaintiff's briefs. Moreover, the Tennessee

Supreme Court's decision clearly recognized an officer's duty to enforce a judgment, which appears to undercut Plaintiff's suggestion that the officers should have applied the credits despite Judge Allen's instruction. As was the case with *Coley*. Ray has failed to demonstrate that *Shorts* has placed the statutory or constitutional question before the Court "beyond debate."

Finally, the Individual Defendants offer the declaration of Rudder, who stated therein:

. . . Tennessee law is not clear on how a jail should apply said credits. Thus, city and county jails across Tennessee calculate and apply jail credits differently because state law is not clear on how said credits should be calculated or applied.

Specifically, there are questions not answered under Tennessee law concerning whether an inmate's time in jail should be calculated on a day to day, week to week, or month to month basis. Also there has been discussions as to how many days are to be considered in a sentence of 11 months and 29 days and there are different methods used by different facilities as to said timeframe. For example, some jails will not provide an inmate "work credits" until he has worked more than 25% of his entire sentence because before he does so, they only apply the "good time credits," which amount to 25% of his sentence. Thus, in such a situation, in inmate serving 11 months, 29 days, would not receive any work credits until after he worked around 91 days. Other jails, like the Madison County Jail, calculate an inmate's credits on a monthly basis, so that once an inmate has worked enough in a month to cover more than 25% of his time in that month, he receives "work time credits" instead of "good time credits" for that month. Further, some jails calculate the credits on the back end of the entire sentence, including the probationary period. Thus, an inmate sentenced to "shock probation" would receive work credits on his entire sentence, not just the portion of the sentence spent in jail, meaning he would likely spend no less time in jail.

As can be seen, applying jail credits has caused much confusion among jails across the state of Tennessee. In 2012, I contacted the [Tennessee County Services Association ("TCSA")] to inquire about their positions on how to apply the credits in an attempt to ensure that the Madison County Jail was fully complying with state law in applying inmate credits. I was told that jails across the state of Tennessee calculate said credits differently and that there is no clear answer on how they should be applied. Also as a part of my job I have attended numerous conventions and meetings where the subject is discussed and again there have been expressed numerous opinions as to how the credits are to be calculated, applied and given and all parties can point to the opinions and law to support their respective positions.

(D.E. 21-4 ¶¶ 10-12.)   However, Plaintiff objects to the proffer of the final paragraph of the declaration on admissibility grounds.   Under Fed. R. Civ. P. 56(c), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. . . .  A . . . declaration used to . . . oppose a motion must . . . set out facts that would be admissible in evidence . . ."  Fed. R. Civ. P. 56(c)(2) & (4).  Ray insists that the statement constitutes hearsay, defined by the Federal Rules of Evidence as "a statement [which may include a written assertion] that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(a) & (c).  Hearsay is not admissible.  Fed. R. Evid. 802.

The Court assumes the Plaintiff challenges the admissibility of what Long was told by the TCSA.  The statement is inadmissible, and may not be considered by the Court, to the extent it is submitted to prove the truth of the matter asserted.  *See Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) ("Evidence submitted in opposition to a motion for summary judgment must be admissible.  Hearsay evidence must be disregarded.").  However, it seems admissible to show that he attempted to obtain clarification on the issue.  The remainder of the quoted statement appears to the Court to not be hearsay.

In sum, and for the reasons articulated in this section, Ray has failed to establish that the Individual Defendants were in contravention of clearly established law.  Therefore, they are entitled to qualified immunity.  *See Taylor v. Barkes*, 135 S. Ct. 2042, 2045 (2015) (where defendants did not flout clearly established law, qualified immunity was warranted).  The federal claims against these Defendants are DISMISSED.[10]

---

[10]Based on its ruling, the Court need not address the other arguments offered in support of summary judgment in favor of the Individual Defendants.

<u>Liability of the Municipality.</u>

The Court's dismissal of the Plaintiff's claims against the individual officers does not necessarily resolve his claims against the County. "To prevail in a § 1983 suit against a municipality, a plaintiff must show that the alleged violation occurred because of a municipal policy, practice, or custom; a municipality may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Brown*, 2016 WL 683260, at *10 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)) (internal quotation marks omitted). "Beyond having to identify conduct properly attributable to the municipality, a plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the moving force behind the injury alleged." *Id.* (citing *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. at 404) (internal quotation marks omitted). "In other words, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* (internal quotation marks omitted).

In *Shorts*, the Sixth Circuit addressed a municipality's failure to implement procedures necessary to protect an inmate's right to due process in a case of over-detention. *Shorts*, 255 F. App'x at 59-60. Shorts, like Ray, was sentenced to split confinement under Tennessee law. *Id.* at 47. After a period of time at the Carroll County, Tennessee, jail, he began to inquire of the chief jailer, Sue Barnes, as to his release date. *Id.* at 48. She contacted a state parole officer several times but received no reply. *Id.* Two months later, he was still in jail with no prospects of release. *Id.* Almost a year after his initial inquiry, Shorts' family hired an attorney and he was released shortly thereafter. *Id.* at 48-49.

The court found as follows:

In moving for summary judgment, . . . the County did not produce or identify any evidence to demonstrate the existence of *any procedure at all,* let alone a

procedure that would ensure due process. There is no evidence in the record as to what, if anything, Chief Jailor Sue Barnes was actually *required* to do under the present circumstances; what process, if any, existed by which Sue Barnes . . . would investigate the facts asserted by Shorts or overcome the apparent indifference or incompetence of [the state parole officer] . . .; or what process, if any, existed for Shorts himself to overcome the apparent indifference or incompetence of Sue Barnes. Absent such evidence, we cannot determine at [the summary judgment stage] whether the Sheriff's Department policy (or apparent lack of policy) satisfies the Sheriff's duty to protect the rights of inmates such as Shorts.

*Id.* at 60.

Here, evidence has been presented by the County that, pursuant to its general policy to ensure inmates' sentences were adequately recorded into the Jail's computer system, Long and Rudder went to Allen's office to obtain clarification of the sentence. However, there is no proof of a process by which Jail officials could attempt to overcome any disagreement with Judge Allen, such as contacting the state attorney general for instance; or of any procedure for Ray himself to surmount any indifference or incompetence on the part of Long or Rudder. Viewing the evidence in the light most favorable to the Plaintiff, a reasonable finder of fact could determine that the procedures afforded by the County, or lack thereof, failed to provide Ray due process under the Fourteenth Amendment. On this basis, the Court cannot grant summary judgment for the County. *See id.*

### State Claim.

State law claims against governmental entities and their employees are governed by the Tennessee Governmental Tort Liability Act (the "GTLA"). *See* Tenn. Code Ann. § 29-20-101; *Tillman v. Decatur Cty.*, No. 15–01068 JDB-egb, 2015 WL 5675843, at *5 (W.D. Tenn. Sept. 25, 2015). Plaintiff's state law claim would ordinarily confer supplemental jurisdiction in this Court because it arises out of the same facts and forms part of the same case or controversy. *See* 28 U.S.C. § 1367(a). However, GTLA claims must be brought in "strict compliance" with the

terms of the state statute.  *See* Tenn. Code Ann. § 29-20-201(c).  The GTLA expressly states that Tennessee "circuit courts shall have exclusive original jurisdiction" over claims brought pursuant to its provisions.  Tenn. Code Ann. § 29-20-307.  A district court may, in its discretion, decline supplemental jurisdiction over a state law claim even if jurisdiction would otherwise be proper under § 1367(a).  Section 1367(c)(4) allows a district court to "decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . .[,] in exceptional circumstances, there are other compelling reasons for declining jurisdiction."   The Sixth Circuit has held that "the Tennessee legislature expressed a clear preference that [GTLA] claims be handled by its own state courts.   This unequivocal preference of the Tennessee legislature is an exceptional circumstance [under § 1367(c)(4) ] for declining jurisdiction." *Gregory v. Shelby Cty.*, 220 F.3d 433, 446 (6th Cir. 2000).  Consequently, district courts in Tennessee have regularly declined to exercise supplemental jurisdiction over GTLA claims, and this Court finds no compelling reason to act differently in this case.  *See, e.g., Tillman*, 2015 WL 5675843, at *5; *Hill v. Blount Cty. Sch.*, No. 3:14-CV-96-PLR-HBG, 2015 WL 729547, at *6 (E.D. Tenn. Feb. 19, 2015); *Woodward v. City of Gallatin*, No. 3:10-1060, 2013 WL 6092224, at *9-10 (M.D. Tenn. Nov. 19, 2013).  Therefore, this Court declines to exercise supplemental jurisdiction over Plaintiff's state law claim.

*CONCLUSION*

The Defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART.   The Plaintiff's claims against Defendants Woolfork, Long and Rudder are DISMISSED, as is his claim under state law.  The claims against Madison County will proceed to trial.

IT IS SO ORDERED this 16th day of March 2016.

s/ J. DANIEL BREEN
CHIEF UNITED STATES DISTRICT JUDGE